2016 IL App (1st) 131009
No. 1-13-1009
Opinion Filed November 9, 2016

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court<br>) of Cook County,<br>) Illinois. |
| Plaintiff-Appellee, | ) |
| v. | ) No. 05CR17342 |
| DAVID BANKS, | ) The Honorable<br>) Kevin M. Sheehan, |
| Defendant-Appellant. | ) Judge Presiding.<br>)<br>) |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.

¶ 1       On the morning of September 8, 1990, the Chicago Fire Department responded to a fire in the basement of a multi-unit apartment building at 1058-1060 West Lawrence Avenue in Chicago. The bodies of a 55-year-old woman and a 79-year-old man and were discovered in the fire. The manner of death was determined to be homicide, and the fire was determined to have been caused by arson. A 12-year-old girl, T.C., reported having been raped and doused in fire accelerant by the offender in the basement but escaped to call for help.

¶ 2     Defendant David Banks was arrested after a 2005 "cold hit" in the DNA database. He was charged by indictment with 24 counts of first degree murder and one count of arson in regards to the double homicide and sexual assault. The indictments alleged that defendant murdered victims Irene Hedgpeth and Lawrence Soucy while committing the offenses of criminal sexual assault against T.C. and arson. A jury trial was held in 2013, after which the jury found defendant guilty of arson as well as the two murders. The trial court sentenced defendant to two terms of natural life imprisonment for the murders, to be served consecutively, and a term of 15 years' imprisonment for arson, also to be served consecutively. On appeal, defendant contends (1) the trial court erred in admitting DNA evidence at trial; (2) he was prejudiced by the "misuse" of his prior criminal record at trial; (3) he was prejudiced by comments by a testifying police officer regarding his invocation of his right to remain silent and his request for counsel; and (4) he was deprived of the effective assistance of trial counsel for a series of alleged trial errors. For the following reasons, we affirm.

¶ 3                              BACKGROUND[1]

¶ 4     Defense counsel filed several motions prior to trial[2] including motions asking to suppress defendant's statement and motions relating to the introduction of DNA evidence at trial, asking to bar the introduction of other crimes evidence at trial, asking to be allowed further testing of the biological materials and databases for use at trial, and requesting greater latitude in the cross-examination of the State's DNA expert. Relevant to this appeal,

---

[1]This court provides an extensive background in order to give full consideration to the many fact-intensive issues defendant raises on appeal.

[2]There was extensive motion practice as well as hearings in this case, much of which concerned the fact that the prosecution began as a capital case. As this is not germane to the issues at bar, this court will not concern itself with this portion of the case history.

defendant specifically sought (1) a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) regarding whether DNA testing without the original controls or blanks was a scientifically valid methodology, (2) to exclude the DNA evidence where some of the material was inadvertently lost during testing in the laboratory, and (3) a search of the National DNA index system "for actual 9-loci pair matches that actually exist in the databases for the 9-loci identified in this case," and "for the frequency of each of the alleles identified in this case as they actually exist in the databases."

¶ 5    After a hearing, the trial court denied the request for a *Frye* hearing regarding the DNA testing without the original blanks, stating: "*Frye* does not apply once determined that the scientific method is generally accepted" and noting that "[t]here is no *Frye* standard plus reliability standard, no independent evaluation of the theory or the reliability once the general acceptance threshold has been met. Reliability comes from general acceptance." The court explained that defendant's arguments regarding the DNA testing "goes to the weight, not the admissibility under *Frye*," and that defendant's concerns could be addressed at trial through "vigorous cross-examination presentations of contrary evidence such as expert testimony." It stated: "The *Frye* standard applies only if scientific principle and technique or test offered is new or novel."

¶ 6    The court also held a hearing on defendant's motion for relief in conjunction with destruction of DNA or related evidence. The court denied the motion, finding that the DNA, which was inadvertently spilled during laboratory testing, was not materially exculpatory evidence and that it was not destroyed in bad faith. Additionally, the court admonished defense counsel that use of the term "destroyed" was not appropriate, stating, "It's spilled, right? We're talking semantics here, something certainly wasn't destroyed in a bad faith

sense or somebody just took something and obliterated it. *** What we have here is something that's spilled during a test requested by the parties[.]"

¶ 7     Defendant's motion for a DNA database search was filed with the trial court on May 20, 2010. By that motion, defendant explained that he was arrested based on a "partial, 9 Loci DNA match to a buccal swab taken from him." The motion also stated:

> "5. The Illinois State Police Forensic Scientist in this case, Cynara C. Anderson, opined that the statistical probabilities of such a match were 1 in 52 million Black, 1 in 390 billion White, or 1 in 200 billion Hispanic unrelated individuals at the 9 loci profiled.
>
> 6. However, the Forensic Scientist from the Illinois State Police printed a State Match Detail Report that indicates that the 'Locus Match Stringency' parameters were set at high, which nevertheless resulted in 2 matches, 1 at 10 Loci and 1 at 6 Loci; presumably the '10 Loci' match is actually the 9 Loci match excluding the Amelogenin Loci (X,Y). It is not clear what the other 6 Loci match was.
>
> 7. Moreover, an Arizona database search of 65,493 specimens revealed 120 pairs of 9-loci matches; an Illinois database yielded 900 pairs of matches at 9 loci; and a Maryland study 32 pairs of 9-loci in a database of less than 30,000. Wherefore, the State's theoretical statistical analysis, which lends relevancy and weight to the State's DNA evidence is seriously in doubt considering actual DNA searches of real profiles that exist in actual DNA databases."

Defendant specifically requested the court to order the State Police to search the following databases: "a. offenders maintained under 730 ILCS 5/5-4-3(f); b. unsolved crimes

maintained by state and local DNA databases by law enforcement agencies; and/or c. the National DNA index system" using the following formulas:

"a. for actual 9-loci pair matches that actually exist in the databases;

b. for the actual 9-loci identified in this case, but utilizing Low, Medium and High locus Match Stringency; and

c. for the actual frequency of each of the alleles identified in this case as they actually exist in the databases."

This motion was held in abeyance.

¶ 8        On July 19, 2012, defense counsel withdrew the DNA database search motion, explaining to the court:

"THE COURT: Database search motion withdrawn?

[PUBLIC DEFENDER CHRIS ANDERSON:] Yes, motion for DNA Database search. I was able to actually find—the FBI had actually done a CODIS allele frequency analysis for each of the databases, so I didn't need it because I have it now.

THE COURT: Okay. That database motion is withdrawn.

[PUBLIC DEFENDER ANDERSON:] That issue is done. After further discussions with the lab, I realize that by entering the profile in this case that they are searching all additional cases in the CODIS database against that COPA [*sic*] any new ones put in so that in effect is being done anytime—

THE COURT: I believe [Assistant State's Attorney Mary Lacy] mentioned that on the last court date that they continually search during the pendency of the case.

[PUBLIC DEFENDER ANDERSON:] Right—well, perpetually they search. Third the issue is the National DNA Search using the profile in this case for purposes of trial strategy, general strategy, we are not pursuing that issue, Judge. So all of these things that we requested have been resolved, so I'm asking leave to withdrawal [*sic*] that motion, Judge.

THE COURT. Okay."

¶ 9    Defendant also filed a motion to suppress his statement, as well as a supplemental motion to suppress statements. At the end of the hearing, the trial court made extensive findings of fact, after which it denied the motion, noting:

"For the foregoing reasons, respectfully your motion to suppress statements is denied. The court specifically finds that the defendant was advised of his rights, that he waived his rights until he asked for an attorney when all questions ceased ***.

He was never confronted with material misrepresentations. The statements, whatever they were obtained [*sic*] by the defendant, from the defendant, were not obtained as a result of physical or psychological or mental coercion.

The court finds whatever statements that the defendant made were voluntarily of his own free will. And the first time the defendant invoked his right to attorney was to [the assistant State's Attorney] after which questioning ceased.

Respectfully, your motion to suppress statements is denied."

Also prior to trial, the State filed a motion *in limine* seeking to introduce evidence of a prior crime at trial, that is, a 1984 sexual assault, as relevant to the issues of defendant's propensity

to commit sexual attacks and to motive and intent, as two of the murder counts on trial were predicated on the alleged sexual assault of T.C. After hearing arguments from the parties, the court allowed evidence of the prior sexual assault as evidence of defendant's propensity to commit sexual attacks, motive, and intent, as two of the murder counts on trial were predicated on the alleged sexual assault of T.C. Specifically, the court determined:

> "It is clear that in viewing the proof of other crimes sought to be admitted, it's relevant to the issues of defendant's propensity to commit sexual attacks and to motive and intent. The statute [and] case law mandates this Court to allow the People to present evidence of other crimes discussed above."

¶ 10        Defendant also moved to bar the use of the 1984 sexual assault case and a 1990 murder conviction for impeachment purposes should he testify. The State agreed not to use the 1984 sexual assault case for impeachment. The court then allowed evidence of the 1990 murder conviction "for the very limited purpose" of impeachment in the event defendant were to testify.

¶ 11        At trial, T.C. testified she was a 12-year-old sixth grader in September 1990. She lived in the second floor apartment at 1060 West Lawrence with her mother, stepfather, and two sisters. She had slept overnight at her father's house a few blocks away and was returning to her own apartment at approximately 8:30 on the morning in question. Although she did not know how big she was at the time of the attack, she testified she was smaller at the time of the attack in 1990 than she was at the time of trial. At the time of trial, she was 4 foot, 11 inches tall and weighed 90 pounds. As she approached the back entrance to her building, a man grabbed her from behind and covered her mouth with his hand. He dragged her down to the basement apartment where she saw a woman and a man. She recognized the woman as

Pat, the building manager, and the man as a resident of the building. Both of the victims had their hands tied and their mouths gagged. Pat was moaning. The man was on the floor, not moving. The offender hit and kicked T.C. He ordered her to remove her pants and underpants. He pulled them off of her after she resisted. He then stuck his finger and penis into her vagina. While this was happening, T.C. heard Pat say, "don't hurt her, let her go." The attacker responded, "shut up, I kill you."

¶ 12     After sexually assaulting T.C., the assailant picked Pat up off of the floor and put her on a bed. Then he walked to the man, still on the floor, and kicked him. T.C. then watched as the assailant poured what looked and smelled like gasoline on both the woman and the man. He then returned to T.C., picked her up, and laid her on the floor near the bed. He soaked her pants and underpants in gasoline and ordered her to put them back on. When she refused, he put them on her. She then watched him rummage in his duffel bag and retrieve a bicycle chain lock. He put the chain around T.C.'s neck and choked her with it. She tried to fight and resist, but slipped in and out of consciousness. When she came back to consciousness, she was laying on the floor. She acted like she was dead and watched her assailant look for matches. He found the matches and lit a fire on the bed near Pat. T.C. continued to play dead as the room filled with smoke and fire, and she watched the attacker grab his duffel bag and leave through the front door. After he left, she got up, attempted unsuccessfully to rouse Pat and the man, and then escaped. She ran upstairs to her apartment, told her mother what happened, and they left the building. T.C. was taken to the hospital.

¶ 13     At trial, T.C. described her attacker as having long hair pulled back in a ponytail and wearing a sleeveless shirt. T.C. also described a big "greenish color" tattoo that "was looking like a dragon" on his arm. She remembered he was wearing a chain around his neck that held

two credit card-sized cards. T.C. did not identify defendant at trial has her assailant. In 1991, she identified another man, Albert Chaney, as her assailant. Chaney was arrested at that time, but subsequently cleared by DNA evidence and released in 1993.

¶ 14　　Joanne Vo, T.C.'s mother, testified she heard banging on her apartment door at approximately 11:15 a.m. on September 8, 1990, and opened the door to find T.C. crawling on the ground, her face black and red, and a line on her neck. T.C. smelled like gasoline and her clothes were wet and dirty. Vo took T.C. to the hospital.

¶ 15　　T.C. was examined at Children's Memorial Hospital by Dr. Ramona Slupik. Dr. Slupik testified that T.C. had been severely traumatized. Her eyes were swollen, the whites of her eyes were red and had burst blood vessels, and she had bruise marks and a strangulation mark around her neck. Dr. Slupik testified that T.C. was "trembling, but she was coherent" during the examination, and was able to answer the doctor's questions. T.C.'s genital area had swollen labia, a thin bloody discharge, and slightly dried white secretions on the outside of the hymen. In Dr. Slupik's opinion, there was "convincing evidence of blunt force penetrating trauma," or "penile penetration." Dr. Slupik confirmed the presence of sperm under a microscope, took cultures to test for sexually transmitted diseases, and then collected DNA swabs from the oral cavity, vagina, and rectum, as well as fingernail scrapings for a rape kit. These items were each labeled individually, sealed, and sent to the crime lab.

¶ 16　　The parties stipulated that nurse Mary Whiteford took the rape kit from Dr. Slupik and put it in hospital storage, that the kit was then retrieved by nurse Sandra Roy and given to Chicago Police evidence technician Roy Fondren, who then stored it with the evidence and recovered property section of the police department. The parties stipulated that a proper chain of custody was maintained over the kit at all times.

¶ 17       Retired Fire Marshall Louis Outlaw testified that he responded to a fire alarm at the three-story apartment building at 1058-1060 West Lawrence on September 8, 1990. The fire was extinguished by the time he arrived, and he spoke with firefighters on the scene. Outlaw determined the fire was mainly contained to the basement apartment. He then entered the rear basement apartment and saw a male victim on the floor who appeared to have had his throat slashed and a female victim on a bed who was badly burned over her entire body. Outlaw determined an accelerant had been used to advance the fire, that the ignition source was a human action such as an open flame, and that someone had purposely set the fire.

¶ 18       Illinois State Police acting trace chemistry group supervisor Alan Osoba, who at the time of the fire worked as a criminalist or police chemist for the Chicago Police Department's crime laboratory, testified he tested T.C.'s recovered clothing as well as four debris cans collected from the fire scene for accelerants. T.C.'s clothing and three of the four debris cans contained petroleum distillate residue such as diesel fuel or charcoal lighter fluid.

¶ 19       Retired Chicago Police Detective Wayne Johnson testified that he was working as a detective assigned to the violent crimes unit in September 1990. He arrived at the scene of the crime around 1:30 p.m. and went in to the basement apartment to process the crime scene. He then went to the hospital to interview T.C. He testified T.C. described her attacker as: "male, black approximately six feet tall, approximately 200 pounds with long hair worn in a ponytail, growth—beard growth on his face, a short sleeved shirt, white Nike gym shoes, and a sliver chain around his neck that displayed two cards that she compared to credit cards at the time." She said he carried a tubular gray duffel bag. He testified that T.C. was traumatized, but that a few days later she was able to provide more detail about her attacker. At that time, T.C. said "she thought he had a tattoo on his upper arm that to her looked like a

dragon." She described it as light blue or faded blue green in color, but was unable to give great detail due to the lighting and the traumatic nature of the attack.

¶ 20 Dr. Edmund Donoghue, then the Cook County Medical Examiner, testified that he performed the autopsies of both Hedgpath and Soucy. He determined that both victims died before the fire was set, Hedgpeth of strangulation and Soucy from blunt force trauma. He described Hedgpeth as a 55-year-old white female with burns over 100% of her body, including full thickness burns. Hedgpeth also had internal injuries including fractures consistent with manual strangulation. Dr. Donoghue described Soucy as a 79-year old white male with partial thickness burns on much of his body. Soucy had a 2-inch deep wound through his right eye, consistent with being stabbed with an ice-pick-like instrument. He also had numerous skull and rib fractures consistent with being stomped or kicked, as well as a laceration to his neck involving the jugular vein consistent with his neck being cut with a knife.

¶ 21 Forensic Scientist Edgardo Jove testified that he worked at the Chicago Police Department crime lab from 1991 to 1996. He received the rape kit taken from T.C. for testing on July 20, 1993. The kit contained oral, rectal, and vaginal swabs and smears; microscopic slides; and fingernail samples. He examined the vaginal smears for the presence of sperm and tested the body fluids found on the vaginal swab. He then sent the samples for DNA testing to the Illinois State Police forensic lab in Springfield. Jove testified that he maintained a proper chain of custody over the items.

¶ 22 Dr. Elizabeth Benzinger testified as an expert in the field of forensic DNA analysis. Although by the time of trial she worked with the Ohio Bureau of Criminal Investigation, from 1990 to 1996 she worked at the Illinois State Police crime lab and was one of four

individuals who set up the forensic DNA typing program from the Illinois State Police in Springfield. She testified that she received sealed items including T.C's vaginal swab and blood samples from T.C. and Albert Chaney pertaining to this case in October 1993. She described DNA to the jury as a "long string like molecule" that is "the blueprint of life." She described its usefulness in forensic analysis as:

"DNA is useful for forensic analysis because scientists believe that no two individuals have the exact same DNA except for identical twins. So we are able to look at the DNA from one person, their oral swab, their saliva, their blood, all the tissue of their body, their bones, their semen, all have the same DNA. So we can compare a sample from the blood or an oral swab from the mouth to DNA from a crime scene, such as blood or semen, and use that to determine if the individual could be the source of that crime scene sample."

¶ 23        She described four steps to DNA tests: (1) extract the DNA from the item using a reagent that is "essentially high tech laundry detergent," which helps get the DNA out of, for example, the shirt it may have been on; (2) solubilize the DNA, or get it into solution and remove the other parts of the cell, separating a sexual assault sample into a male sample and a female sample; (3) determine "how much DNA we have" and amplify the DNA; and (4) examine the different areas of the DNA that are known to be highly variable and make comparisons. She explained that DNA amplification is "essentially chemical Xeroxing" in order to improve the sensitivity of DNA tests. Dr. Benzinger explained that, in 1993, testing included using an RFLP method "that is responsible for the bar code-like patterns that we see on TV" that did not use the amplification and was not very sensitive, and also a method based on the amplification process known as DQ-Alpha. The DQ-Alpha test "examines some

variation in the DNA on one of the chromosomes." She said the DQ-Alpha test is "only one test compared to what we use today which is an array of tests."

¶ 24 When Dr. Benzinger received the samples from T.C. and Chaney, she numbered T.C.'s blood standard 1, Chaney's blood standard 2, and the vaginal swab 3. Dr. Benzinger testified that she then extracted T.C.'s and Chaney's DNA from the blood samples. She also extracted DNA from the vaginal swab. Dr. Benzinger ran controls and created a reagent blank during her testing. She explained the controls process:

"Q. [ASSISTANT STATE'S ATTORNEY DAVID WEISS:] When you're doing this test, do you work with any types or do you perform any types of control to determine whether or not you've done anything to contaminate or do anything to the sample?

A. [DR. BENZINGER:] A. Yes, because of the sensitivity of these tests, we run controls to tell us whether we are introducing extraneous DNA and also whether our methods are working correctly.

So the controls I used were samples that I worked with that I placed only reagents in, only the chemicals that I was using. And my expectation was that I should get no DNA type from them if they were not introducing DNA on their own.

Q. Was that the result, no DNA?

A. Yes."

¶ 25 Dr. Benzinger obtained profiles using DQ-Alpha testifying from the blood standards of T.C. and Chaney, as well as from the vaginal swab. The profile from the vaginal swab did not match the profile from Chaney's blood standard. This excluded him from having

contributed to the vaginal sample, that is, he was not the source of the semen on the vaginal swab. Dr. Benzinger then followed the lab's procedure: she dried the DNA she had extracted from the vaginal sample on a piece of filter paper, froze it to preserve it, and sealed it. She testified she maintained a proper chain of custody at all times during her testing.

¶ 26      On cross-examination, Dr. Benzinger agreed that DQ-Alpha testing has now been replaced by DNA testing known as short tandem repeat, or STR, testing. DQ-Alpha tests at one area of variation in a sample, while STR can test at 13 locations of a sample. In other words, DNA testing has improved over the years to be more sensitive.

¶ 27      Chicago Police detective Thomas McIntyre was assigned to the cold case squad in 2002, when he began a file review of the murders of Hedgpeth and Soucy. After learning that the rape kit had been destroyed, he learned that DNA had been extracted from the kit samples. He sought out the DNA extracts. Detective McIntyre located the DNA extracts in February 2005 and submitted them for DNA analysis. Later that year, he received the name of an individual who had been identified in the FBI database from Anderson, who informed him she needed a confirmatory buccal swab. On Jun 29, 2005, Detective McIntyre obtained a warrant for a swab from defendant, and an evidence technician took a buccal swab from defendant and photographed the tattoo of green roses on his right arm on June 30, 2005. Detective McIntyre traveled to Peoria to arrest defendant and then transported defendant back to Chicago.

¶ 28      The parties stipulated that retired Chicago Police evidence technician Kerry Watters would testify that she collected a buccal swab from defendant on June 30, 2005. She also photographed his arm and tattoo at that time. The buccal swab standard was subsequently

submitted to the Illinois State Police crime lab for DNA analysis, and a proper chain of custody was maintained over the evidence at all times.

¶ 29    Illinois State Police forensic scientist Cynara Anderson testified as an expert in her chosen field. Defense counsel cross-examined her as to her qualifications, asking her if she had formal training in population statistics and DQ-Alpha testing. As to her qualifications, she testified she had completed both a forensic biology training program and a DNA analysis training program, and had been previously qualified as an expert in both biology and DNA on numerous occasions. She admitted she does not have "formal training in DQ-Alpha," and explained that population genetics was "one of our modules in our DNA training as well as I completed course work in my college education." She opined that population genetics were "to a certain extent" one of her areas of expertise. She testified she had studied "about the extent of actual preference of DNA" as "they actually exist in the population," and agreed she had studied statistics and population statistics. She agreed that the majority of her training and expertise "is with respect to DNA, not to statistics."

¶ 30    Anderson testified that she received DNA samples of extracted DNA in the T.C. case in February 2005.[3] Sample 1A was a DNA standard extracted from T.C., sample 2A was a DNA standard extracted from Chaney, and sample 3A was the female fraction (F1), sperm fraction (F2), and DNA extracted from the vaginal swab (F3). Anderson testified that, because the DNA was dried inside the tubes, she began by adding liquid to sample 1A, the standard from T.C., and sample 3A, the extractions from the vaginal swab. She also created a blank to monitor the analyses for any contamination. After creating the blank, she had five

---

[3]Anderson testified she first received the incorrect evidence package in July 2004. She looked at the package, saw that it was not what she needed, and sent it back. She received the correct package in February 2005 and proceeded to test the contents as described herein.

tubes altogether. She tested the blank tube, which should not contain any DNA, and did not receive a DNA result. This meant that she had not introduced any contamination throughout her analysis. Therefore, she began the process of amplification, or making copies of the DNA in order to have a sufficient amount to "get a decent DNA profile from the extracted DNA." She transferred the DNA from T.C., F1, F2, and her blank to tubes and put them in a machine to be amplified. Anderson testified that, during the preparation of the amplification stage, she dropped the F2 tube (the sperm fraction from the vaginal swab) onto her exam paper. She was still able to put the required amount of DNA into the first tube for the 9-loci amplification, but was unsure if she had enough for the second tube for the other 4-loci amplification. She put the DNA into the two tubes and amplified it. After amplification, the samples, one 9-loci tube and one 4-loci tube, were ready to be put into another instrument in order to generate the DNA profiles. In the 9-loci tube, the non-sperm fraction (F1) generated a profile matching the standard from T.C., and the sperm fraction generated an unknown male profile. Anderson did not get any results from the 4-loci tube. She testified it is not uncommon to not get results on the 4-loci tube.

¶ 31    On May 23, 2005, Anderson entered the unknown male profile into the FBI database and got two possible matches. One of these possible matches was defendant along with his various aliases, and the other matched to a private laboratory. She telephoned the private laboratory and determined that they had made an error in uploading certain information such that, in the end, the second possible match was not a match. The nine loci matched to defendant. Anderson requested a "confirmatory standard" from the Chicago Police so she could perform an analysis to confirm the hit. She received that confirmatory standard in

16

September 2005, and extracted a DNA profile which matched the profile identified in the F2 sperm fraction taken from T.C.'s vaginal swab.

¶ 32    Anderson testified that she then performed a statistical calculation of how rare the profile identified in the F2 sperm fraction would be in a given population. She testified:

> "A human DNA profile was identified in Exhibit 3A, which matches the DNA profile of [defendant]. This profile will be expected to occur in approximately 1 in 52 billion blacks, 1 in 390 billion white, or 1 in 200 billion Hispanic unrelated individuals at the nine loci I worked with."

¶ 33    Anderson also testified that, after she entered the sperm fraction in the database, the DNA profile is "continually run as of now," that every time somebody puts a profile in the database, it is run against the DNA in this case. Since the database hit on defendant's profile in 2005, it has never hit to any other person or any other profile in the database. If it were to hit on another individual or profile, Anderson would be notified.

¶ 34    On cross-examination, Anderson explained her process for generating the probability statistics for the rarity of the DNA profile. She testified that there are 13 loci from which to test. The value at each loci has a frequency of occurrence, and there are two possibilities at each loci. The chances of the two values at each loci are added together and then multiplied for the next location. Anderson acknowledged on cross-examination that she was only able to determine the values at nine loci because she spilled the DNA, that she did not know the profile for the additional four loci, and that if any of the remaining four loci did not match defendant, he would be excluded as the offender.

¶ 35    Blake Willey, a former administrator at Somerset Nursing Home, located two blocks from the scene of the crime, testified that defendant worked at the nursing home from May

1990 to February 1991. During that time, nursing home personnel had to wear picture employee identification cards and carry time clock punch cards. The picture identification card was white and "about the size of a credit card." He testified that some employees wore their identification on a chain around their neck.

¶ 36     Chicago Police Lieutenant Anthony Wojcik testified he was a sergeant in the cold case homicide investigation unit on June 30, 2005. He spoke with defendant that day in an interview room at the police station. After advising defendant of his rights, defendant indicated he understood them. Then Lieutenant Wojcik went over his rights a second time. He asked defendant if he understood he was under arrest for the murders of Hedgpeth and Soucy, as well as for the rape and attempted murder of a young girl, and for arson of the residential building at 1060 West Lawrence. Defendant said he understood that was why he was in custody. Defendant asked what was happening in the case. Lieutenant Wojcik told defendant that the detectives were just about finished with their investigation and had contacted the State's Attorney's office. He told defendant a State's Attorney was on her way to the police station and would review the case with the detectives and determine whether charges should be brought against him. Wojcik testified, "I told him this investigation has shown without doubt that you're the guy that committed those crimes that you're under arrest for. I said I believe you're going to be charged with those crimes." Defendant asked what the statute of limitations for the crimes was, and Wojcik told him there was no statute of limitations on "murder related crime."

¶ 37     Lieutenant Wojcik testified:

"Well, he was quiet for a little while, then he just said I'm tired. He said I'm tired of denying that I know anything about this and then he stated—he said it's these blackouts, man. He said I can't control the blackouts.

\* \* \*

He said, yes, throughout his life there would be periods of time where he would have these blackouts. When he had these blackouts, he said the others would take over. He said when the others took over he said I did f\*\*\*d up things that he was then held responsible for and he said in regards to this incident there are things I do remember and some of it that he didn't remember.

\* \* \*

I said, what do you mean by the others? He says that there are two individuals, that they were inside of him, and he said at times they would take over—they would take over his body.

\* \* \*

I asked him what happened \*\*\* in this incident [with the murders of Hedgpeth and Soucy]. He says—he said I blacked out and the others took over."

¶ 38    According to Wojcik, defendant recalled that a day or two prior to the incident, he walked by a gas station and saw a black woman he knew drinking beer with Lawrence Soucy. The woman introduced Soucy to defendant, and defendant started drinking with them. At some point, Soucy told defendant he had some money in a can at his apartment. Eventually defendant and Soucy walked back to Soucy's basement apartment together. Defendant returned to Soucy's apartment a day or two later and started looking for the can of

money. Soucy came in and asked defendant what he was doing, and a white woman entered the apartment and shouted at defendant to get out. Wojcik testified:

> "The next thing he said that he remembered was he was running from the rear of the building and the building was burning and it was on fire. He said he ran through an alley to get away from there, and then later he realized that his hair was frizzed. He said it was frizzed, and then he said it was singed from the flames in the heat.
>
> \*\*\*
>
> He said he went to a beauty salon in the neighborhood, and he had his hair trimmed and then he got a perm."

¶ 39        Lieutenant Wojcik said he asked defendant if he knew the two individuals had been killed, asked him why his semen was in the young girl, and why he set the building on fire. He testified defendant responded:

> "He says when I blacked out he said the others must have made me do things then that I don't remember."

¶ 40        Lieutenant Wojcik testified defendant said he did not remember ever having seen or met T.C. Defendant confirmed he was employed at Somerset House and thought he was on duty or working when he went to Soucy's apartment. Defendant also told Wojcik that he wore his ID cards around his neck, he wore his long hair back in a ponytail, and he had a tattoo on his arm. Defendant identified a photograph of the building at 1058-1060 West Lawrence as Soucy's building. Lieutenant Wojcik then asked defendant if he would speak with the assistant State's Attorney, and defendant said he would.

¶ 41        On cross-examination, defense counsel asked Lieutenant Wojcik why he did not request a court reporter to record defendant's statement. Wojcik responded:

> "[B]ecause at a certain point the defendant asked for an attorney, so we didn't get to that point where we would have called for a court reporter.
>
> ***
>
> *** [I]t would have been—when I got done talking to him it was about 4:15. I want to say it was some time around a little bit after 5:00 o'clock or so when he asked for an attorney. When I was in there with the State's Attorney was the first time he asked for an attorney."

Lieutenant Wojcik explained that it was not his job to call a court reporter, but rather that was the responsibility of the State's Attorney. He said:

> "The State's Attorney would make [the decision to call a court reporter] in consult with [defendant] if he was willing to do that, but while the State's Attorney was speaking to [defendant] he requested an attorney. So at that time all conversation stops."

¶ 42        The trial court then held a sidebar in chambers, and defense counsel asked for a mistrial, arguing that the witness repeatedly emphasized that defendant had requested an attorney. The trial court asked defense counsel why he did not ask for a sidebar earlier, and defense counsel replied, "Because I didn't want to emphasize that he had brought it out[.]" The trial court denied the motion for a mistrial, saying "what prompted the part about the attorney is because you [defense counsel] asked him questions about why weren't charges approved before the State's Attorney got there," and "the only logical answer he could say upon your continuing questioning is, well, because he asked for an attorney. It was not brought out

volitiously [*sic*] by him. In my opinion it was brought out by your continuing questions for that area."

¶ 43    Cross-examination continued, and defense counsel asked Lieutenant Wojcik a series of questions about what he did and did not do while questioning defendant. Specifically, defense counsel asked a series of questions regarding why Wojcik did not drive defendant up to Lawrence Avenue and drive around the neighborhood in order to locate the hair salon where he allegedly had his hair cut after fleeing the fire. Wojcik answered that he tried to find the salon, but did not drive defendant there to do so. Counsel again asked why, when defendant allegedly had said the salon was in the neighborhood but was unsure of the street it was on, Lieutenant Wojcik did not just drive him to Lawrence Avenue to find the salon. Wojcik answered:

> "Again, Counsel, I probably would have done that, but he asked for an attorney, which means at that point everything—any conversations I was having with him about the case had to stop, including putting him in a car and having him to point locations out."

¶ 44    At the close of Wojcik's cross-examination, defense counsel renewed the motion for a new trial, arguing that Lieutenant Wojcik had again mentioned defendant having asked for an attorney. The trial court denied the motion, responding:

> "The problem with this is the way you asked the question once it came out once the charges were approved upon [the assistant State's Attorney] arriving there and it came out that he asked for an attorney and didn't obviously want to talk to her without one, this was a natural response to a question about after he

was through talking putting him in the car and taking him somewhere and having him find someone.

This is exactly what happens when you are not directing him to a particular time. You simply asked a question. I just wanted you to make a record. Your motion for a new trial is denied. This is the fourth time he stated he wanted an attorney."

¶ 45    Assistant State's Attorney Christa Bowden testified that she arrived at the police station around 3:00 p.m. on June 30, 2005. She was a trial supervisor in the felony review unit at the time. She spoke with defendant along with Lieutenant Wojcik. She introduced herself to defendant, advised him of his rights, and told him that she was an attorney but not his attorney. They talked for approximately 30 to 40 minutes. Assistant State's Attorney Bowden testified that defendant acknowledged having talked with Lieutenant Wojcik, and she asked him to tell her what they had spoken about. She testified:

"A. [ASSISTANT STATE'S ATTORNEY BOWDEN:] Well, I had asked him if he would tell me the things that he was talking to [Wojcik] about, and he told me that he remembered that he had been drinking—around the time of the incident he had been drinking with an older white guy and a black woman at a filling station and that he left the filling station with the older white guy, and the black woman didn't come and that he and the older white guy went to a building. The next thing that he remembered after that was that he was running down an alley and ended up at a beauty parlor.

Q. [ASSISTANT STATE'S ATTORNEY MARY JO MURTAUGH:] And did he also tell you that he believed that something weird had happened that day?

A. Yes. He said as he was running down this alley he knew that something had happened, but the next thing he knew he was at a beauty parlor. After he said that [ ] he didn't remember between going to the building with the older white guy and running down the alley thinking something weird had happened and ending up at the filling station, he said at that time that he was ready to die and he just wanted to get it over with.

* * *

Q. Did David Banks tell you anything about when he seemed to get his life together that something happens?

A. Right. So after he said this statement about just wanting to get it over with, that prompted an inquiry about what are you talking about. He said, well, every time he seems to get his life together and gets a job, gets an apartment, gets a woman, people go on and mess things up for him; and he knows that people mess things up for him because other people tell him that they do things that mess things up for him.

* * *

He said he should be in prison so these things don't happen."

When Assistant State's Attorney Bowden asked defendant who these people were, he described them as being a person named Durell, who was a murderer, a person named Snow who is nine years old, and a 63-year-old Portuguese man "who was a pervert, who would

screw anything, in his words, even little girls." She testified that defendant said, "These three, Durell, Snow, and unnamed Portuguese would do things, and he would be the person that would have to take responsibility for those things." She said defendant told her he wanted to tell the truth, that he did not dispute his DNA being at the crime scene, but instead simply did not remember what happened before he was running down the alleyway towards the beauty parlor.

¶ 46    Defendant's statement was neither reduced to writing nor recorded in any way.

¶ 47    The trial court then instructed the jury:

"Ladies and gentlemen, in a moment evidence will be received that the Defendant has been involved in an incident other than those charged in the indictment before you. This evidence will be received on the issue of Defendant's propensity. And may be considered by you only for that limited purpose."

¶ 48    Then, G.R. testified regarding the sexual assault defendant committed against her on November 12, 1984. On that afternoon, G.R. was pushing her 11-month old daughter in a stroller near the 5500 block of South Wabash in Chicago. Defendant crossed the street in front of her and stopped her. He put his hand in his pocket, pointed it at her and said, "Bitch don't move; I have a gun." G.R. begged for her life. Defendant directed her towards a secluded area down a gangway, under a back porch in a "little basement area," and told her to remove her clothes. When she had one leg out of her pants, defendant noticed a man in a nearby yard. He told G.R. to get up. She got dressed and he instructed her to move. He took her into the basement of another apartment building. He told her to take her clothes off and he removed his own pants. He then forced his penis into G.R.'s mouth, put his mouth on her vagina, and had vaginal sex with her. Afterward, he apologized and offered to pay her not to

tell anybody. He walked her home and helped her carry the child up the stairs in her stroller. G.R.'s sister, the sister's boyfriend, and G.R.'s boyfriend were all in the apartment. Defendant sat down in the apartment while G.R. went into her bedroom with her boyfriend. She told her boyfriend defendant had just raped her. G.R. called the police, who came to the apartment and arrested defendant.

¶ 49    The State rested. Defendant asked for a directed verdict, which the court denied.

¶ 50    Defendant testified on his own behalf. He admitted having worked at Somerset House, but denied that he wore his identification cards on a chain around his neck. He denied having ever met Hedgpeth, Soucy, or T.C. He denied having ever been in the building at 1058-1060 West Lawrence. He denied having had anything to do with the crime. He admitted he spoke with Detective Wojcik and Assistant State's Attorney Bowden, but denied having told them he was at all involved in this crime. He denied having told them he had blackouts, nor that there were people inside of him who made him do things. He admitted having worn his hair in a ponytail, but denied that his hair got frizzed or singed in the fire or that he went to a beauty salon in the neighborhood to get it fixed after the fire. He showed his tattoo to the jury. The tattoo, on his right arm, was of roses and a bare-chested woman. He explained that he got the tattoo in 1994 to cover up a previous tattoo. The previous tattoo, which he got in 1989, was of the letters "BGGS" with a pitchfork running through it, which was a symbol of the street gang to which he belonged. Defendant recalled that in September 1990, he lived with a woman named Darlene and took care of her children. He testified he told the detectives that, on the day of the crime, Darlene was in the hospital and he was babysitting her children on the Southside of Chicago.

¶ 51    The defense rested. The State then entered a certified copy of defendant's conviction for murder. The trial court advised the jury:

> "Evidence of the Defendant's previously [*sic*] conviction of an offense may be considered by you only as it may affect his believability as a witness, and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 52    At the close of arguments by both parties, the trial court instructed the jury, in part: "[a]ny evidence that was received for a limited purpose should not be considered by you for any other purpose."

¶ 53    The jury returned a verdict of guilty on all counts: intentional and knowing murder of Irene Hedgpeth and Lawrence Soucy, felony murder based on the offense of criminal sexual assault, felony murder based on the offense of arson, and arson.

¶ 54    Defense counsel filed a motion for a new trial, which the court denied.

¶ 55    At sentencing, the trial court merged the felony murder counts into the intentional and knowing murder counts. It also noted defendant's prior conviction for murder and the sexual assault case. The trial court sentenced defendant to natural life without parole for each count of first degree murder, and a 14-year term of imprisonment for arson, to be served consecutively to the two natural life sentences. Defense counsel filed a motion to reconsider the sentences, which was denied.

¶ 56    Defendant appeals.

¶ 57                              ANALYSIS

¶ 58                              I. DNA Evidence

¶ 59    Defendant first challenges the admission of DNA evidence at trial, arguing that the case "rose and fell on the DNA evidence," which evidence, he argues, should never have been admitted in the first place. He contends (1) there was an unexplained, inexcusable gap in the chain of custody of the DNA evidence between Dr. Benzinger and Anderson; (2) the trial court erred in not granting a *Frye* hearing as to whether Anderson's methodology was accepted in the scientific community; (3) the trial court erred when it denied defense counsel's motion for relief with regard to the spilled genetic material; and (4) the trial court erred in limiting the cross-examination of Anderson regarding studies on 9-loci matches. We address each argument in turn.

¶ 60    Initially, we disagree with defendant's characterization of his trial as one which rested solely on DNA evidence. In his brief on appeal, defendant argues that "[t]his was, at all times, a DNA-driven case." He reminds the court that the prosecutor in closing arguments repeated Anderson's testimony that the semen recovered from T.C.'s vagina matched defendant's DNA at 9 loci, which would be expected to occur in approximately 1 in 52 million Black individuals. He argues "this was a case which rose and fell on the DNA evidence. In fact, there was virtually no forensic evidence tying him to the two murders." He says that, because this was such an old case and defendant only came to the attention of the police 15 years after the murders occurred based on a "cold hit" DNA match, "[w]ithout the DNA *** there is no case here."

¶ 61    It is true the DNA profile generated in this case matched defendant's profile when run through the FBI database in 2005. A confirmatory buccal swab was obtained from defendant at that time, then, which provided confirmation that defendant's DNA matched the DNA evidence recovered in this case at 9 loci. However, in this court's opinion, there was

28

additional evidence presented at trial that also ties defendant to this crime. Most tellingly, defendant provided an inculpatory statement to Lieutenant Wojcik and then to Assistant State's Attorney Bowden in which he implicated himself in the crime. Although the statement was not memorialized in writing or in a recording, both Wojcik and Bowden testified to the statement in great detail. In his statement, defendant admitted to knowing victim Soucy. He described having met him days before the murder and visiting his apartment. He described how Soucy kept a can of money in his apartment and how, on the day of the murders, he returned to Soucy's home to search for the can of money. His search was interrupted first by Soucy and then by Hedgpeth, who demanded he leave. Defendant told both Wojcik and Bowden that he then blacked out. The next thing he remembered, he said, was running down an alley away from the burning building, his long hair singed by fire. He also told both Wojcik and Bowden in great detail that individuals inside of him cause him to do bad things, saying the "others" inside him must have put his semen inside T.C. He told Lieutenant Wojcik that he wore his hair long and in a ponytail around the time of the murders, that he worked at Somerset House during that time, and that he wore his work identification cards on a chain around his neck.

¶ 62      Defendant's statement was corroborated by former Somerset administrator Blake Willey, who testified defendant worked at nearby Somerset House during the time of the murders, that employees were required to wear identification cards which were approximately the size of credit cards, and that many employees wore these cards around their necks. Defendant's statement was further corroborated by T.C.'s testimony that her attacker was a Black man with long hair pulled into a ponytail who wore a chain around his neck with two credit card-

sized cards on it. Essentially, defendant confessed that he committed the crimes under the influence of the "others" inside of him.

¶ 63    For these reasons, we disagree with defendant's representation that the case was based solely on DNA evidence, but instead find that the DNA was one piece of the evidence by which the jury found defendant guilty.

¶ 64                              A. The Chain of Custody

¶ 65    Defendant first contends the circuit court erred in admitting the DNA evidence where there allegedly was a gap in the chain of custody regarding the DNA evidence between forensic scientists Dr. Elizabeth Benzinger and Cynara Anderson. Specifically, defendant argues that, where Dr. Benzinger testified she preserved the extracted DNA by putting it on a piece of filter paper which she then dried and froze, Anderson testified she received the extracted DNA evidence in "tubes." On appeal, defendant argues that these descriptions do not match to such an extent that there was a complete breakdown in the chain of custody that should have resulted in the exclusion of any resulting DNA testing completed on those materials. We disagree.

¶ 66    As a threshold matter, we note that the State argues on appeal, and defendant apparently concedes,[4] that he has forfeited this issue for purposes of appeal by failing to object to it at trial and by failing to raise it in his posttrial motion. See *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion.") (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Nonetheless, defendant urges us to consider his claim under the plain error

_____

[4]Although defendant does not specifically state that he failed to preserve this issue, he argues on appeal that we should review his complaint as plain error. He argues that "this is the kind of error that the Supreme Court has deemed cognizable under the plain error doctrine—there was a 'complete breakdown' in the required chain of custody. *People v. Woods*, 214 Ill. 2d 455, 471-72 (2005)."

doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."); *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 67    The plain error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *Thompson*, 238 Ill. 2d at 613. Specifically, the plain error doctrine permits "a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *Herron*, 215 Ill. 2d at 186-87); see also *Thompson*, 238 Ill. 2d at 613. Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 68    Our supreme court has said:

> "We reject the notion that a challenge to the State's chain of custody is a question of the sufficiency of the evidence. A chain of custody is used to lay a proper foundation for the admission of evidence. Accordingly, a defendant's assertion that the State has presented a deficient chain of custody for evidence is a claim that the State has failed to lay an adequate foundation for that evidence. See 2 J. Strong, McCormick on Evidence § 212, at 9 (5th ed. 1999). Thus, a challenge to the chain of custody is an evidentiary issue that is generally subject to waiver

31

on review if not preserved by defendant's making a specific objection at trial and including this specific claim in his or her posttrial motion." *Woods*, 214 Ill. 2d at 471.

Notwithstanding, our supreme court has recognized that a challenge to the State's chain of custody can be reviewed for plain error in the rare case where there is a complete breakdown in the chain. *People v. Alsup*, 241 Ill. 2d 266, 277 (2011) (citing *Woods*, 214 Ill. 2d at 471-72). The *Woods* court provided an example for plain error review, saying, "in those rare instances where a complete breakdown in the chain of custody occurs—*e.g.*, the inventory number or description of the recovered and tested items do not match—raising the probability that the evidence sought to be introduced at trial was not the same substance recovered from defendant, a challenge to the chain of custody may be brought under the plain error doctrine." *Woods*¸ 214 Ill. 2d at 471-72. The court explained: "When there is a complete failure of proof, there is no link between the substance tested by the chemist and the substance recovered at the time of the defendant's arrest. In turn, no link is established between the defendant and the substance. In such a case, a failure to present a sufficient chain of custody would lead to the conclusion that the State could not prove an element of the offense ***." *Woods*, 214 Ill. 2d at 472.

¶ 69 When the State seeks to introduce an object into evidence, it must lay a proper foundation through either its identification by witnesses or through establishing a chain of possession. *Woods*, 214 Ill. 2d at 466. The character of the object the State seeks to introduce determines which method to establish a foundation the State must employ. *Woods*, 214 Ill. 2d at 466. If an item is "readily identifiable and [has] unique characteristics, and its composition is not easily subject to change," the party may elicit testimonial evidence showing that the item is

the same item recovered and that it is in substantially the same condition as when it was recovered." *Woods*, 214 Ill. 2d at 466. If the evidence is "not readily identifiable or may be susceptible to tampering, contamination or exchange," (*Woods*, 214 Ill. 2d at 467) the party must establish a sufficient chain of custody "that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution" (internal quotation marks omitted) (*Alsup*, 241 Ill. 2d at 274). Once the State has established this *prima facie* case, the burden shifts to the defendant to show actual evidence of tampering, alteration, or substitution. *Alsup*, 241 Ill. 2d at 274-75. Our supreme court has cautioned:

> "In the absence of such evidence [of tampering, alteration, or substitution] from defendant, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination. [Citation.] It is not erroneous to admit evidence even where the chain of custody has a missing link if there was testimony which sufficiently described the condition of the evidence when delivered which matched the description of the evidence when examined. [Citation.] At this point, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence. [Citation.]." *Alsup*, 241 Ill. 2d at 274.

¶ 70   The admission of evidence at trial is a matter left to the discretion of the trial court, and the court's decision on that point will not be disturbed absent an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would adopt the trial court's view. *People v. Taylor*, 2011 IL 110067, ¶ 27.

¶ 71    As noted, defendant failed to properly preserve this issue for appeal. He did not object to the foundation for the evidence at trial, nor did he raise the issue in his posttrial motion. Therefore, the issue is forfeited. See, *e.g.*, *Enoch*, 122 Ill. 2d at 186. Our supreme court has noted that forfeiture in cases such as this is particularly appropriate because, where the defendant fails to object to the foundation of evidence at trial, the State misses its opportunity to cure any error. See *Woods*, 214 Ill. 2d at 470 (the application of the forfeiture rule "is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence" because the "lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level"). Under the plain error rule, we consider whether any error has occurred at all. *Lewis*, 234 Ill. 2d at 43; *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010) ("There can be no plain error if there was no error at all ***."). This requires a "substantive look" at the issue raised. *People v. Johnson¸* 208 Ill. 2d 53, 64 (2003). We will therefore first review defendant's claim to determine if there was any error before considering it under plain error.

¶ 72    Here, the chain of custody presented by the State at trial regarding the collected DNA evidence was sufficiently complete. Chicago Police crime lab forensic scientist Jove testified he received the rape kit taken from T.C. in July 1993. The kit contained oral, rectal, and vaginal swabs and smears; microscopic slides; and fingernail samples. After performing his examinations on the specimens, he sent the samples to the Illinois State Police forensic lab for DNA testing. He testified he maintained a proper chain of custody over the items.

¶ 73    Forensic scientist Dr. Benzinger testified at trial that she received blood reference samples from T.C. and Albert Chaney in October 1993. She specifically testified that the

items were sealed when she received them. She numbered T.C.'s blood standard 1, Chaney's blood standard 2, and the vaginal swab 3. She extracted DNA from the blood standards and the vaginal swab. She then dried the extracted DNA onto a piece of filter paper, froze it to preserve it, and sealed it. She specifically testified she maintained a proper chain of custody at all times during her testing.

¶ 74    Illinois State Police forensic scientist Anderson testified she received tubes with dried, extracted DNA inside them on February 16, 2005.[5] The extracted DNA she received matched the numbers provided by Dr. Benzinger: 1A was the extracted DNA from T.C., 2A was the extracted DNA from Chaney, and 3A was the extracted DNA from the vaginal swab. Anderson specifically described the evidence package she received:

> "At this time I received the tubes of extracted DNA that the prior DNA analyst had created. So there was our Exhibit 1A, which is extracted DNA from [T.C], our Exhibit 2A which was reportedly extracted DNA from Albert Chaney, and Exhibit 3A, which contained the F1 which is the female fraction or the non-sperm fraction, the F2 which is the sperm fraction, and the F3 fraction of extracted DNA from the vaginal swab of [T.C.]."

¶ 75    Defendant's argument that there was a "complete breakdown" in the chain of custody is unavailing where, through the above testimony, the State presented a sufficient foundation and chain of custody to show that the DNA extracts received by forensic scientist Anderson

---

[5]Defendant focuses on the fact that, on July 8, 2004, Anderson received the incorrect evidence package to test. Specifically, Anderson testified at trial that she initially received "a package, but it wasn't the evidence I was looking for" and explained it was "Just some envelopes. They were marked as being swabs from [T.C.], Albert Chaney and [T.C.], but that was not what I was looking for[.]" She requested "different information" and received the package with "the tubes of extracted DNA that the prior DNA analyst had created" on February 16, 2005. In our opinion, this demonstrates Anderson's attention to detail and does not in any way reflect negatively on her work.

were the same DNA extracts tested and preserved by forensic scientist Dr. Benzinger. See, *e.g.*, *Alsup*, 241 Ill. 2d at 274. Because the State has presented a *prima facie* case that the chain of custody was sufficiently complete to make it "improbable that the evidence has been subject to tampering or accidental substitution," the burden shifts to defendant to show actual evidence of tampering, alteration, or substitution of the evidence. (Internal quotation marks omitted.) *Alsup*, 241 Ill. 2d at 274. The defendant fails to do so. In fact, the defense provided no evidence at trial that there was any tampering, exchange or contamination of the DNA material. Defendant, in fact, did not object in any way to the foundation of this evidence at trial. See, *e.g.*, *Woods*, 214 Ill. 2d at 470 (the application of the forfeiture rule "is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence," because the "lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level").[6] Our review of the record does not show inconsistency in the descriptions of the evidentiary material at issue, and the alleged discrepancy does not amount to a "complete breakdown" in the chain of custody. Once the State established the probability that the evidence was not compromised, and defendant failed to show actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not the admissibility, of the evidence. *Alsup*, 241 Ill. 2d at 275. We find no abuse of discretion in the

---

[6]This, in fact, is a prime example of the importance of a timely and specific objection when laying a proper technical foundation for the admission of evidence. Here, Benzinger testified she dried the extracted DNA onto a substrate, or a piece of filter paper, which she then froze to preserve. Benzinger also testified regarding the process of extracting DNA from a substrate by using what she described as a "high tech laundry detergent." Anderson testified that she received tubes containing the "extracted DNA that the prior DNA analyst had created." Had the evidence been challenged at trial, the parties could have clarified whether, for example, the tubes containing the extracted DNA actually contained the piece of filter paper onto which Benzinger had dried the extracted DNA. Because there was no objection at trial, there was no further exploration of the description of the received DNA evidence.

trial court's determination to allow the DNA evidence in at trial. See *Pikes*, 2013 IL 115171, ¶ 12. We therefore find no plain error here. See *Wilson*, 404 Ill. App. 3d at 247 ("There can be no plain error if there was no error at all \*\*\*.").

¶ 76                                    B. No *Frye* Hearing

¶ 77        Defendant next contends that the trial court erred in denying his request for a *Frye* hearing regarding whether forensic scientist Anderson's methodology was accepted in the scientific community. Specifically, defendant argues that he was entitled to a *Frye* hearing because the scientific protocols evolved between when his DNA was tested in 2005 and the time of trial in 2013. We disagree.

¶ 78        In Illinois, the admission of expert testimony is governed by the standards expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *In re Commitment of Simons*, 213 Ill. 2d 523, 529 (2004). Under *Frye*, scientific evidence is only admissible at trial if the "methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d at 529-30 (quoting *Frye*, 293 F. at 1014)). General acceptance of a methodology "does not require that the methodology \*\*\* be accepted by unanimity, consensus, or even a majority of experts." *In re Commitment of Simons*, 213 Ill. 2d at 530; *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002), *abrogated on other grounds by In re Commitment of Simons*, 213 Ill. 2d at 530. The trial court will apply the *Frye* test only if the scientific principle, technique, or test offered by the expert to support his or her conclusion is new or novel. *In re Marriage of Bates*, 212 Ill. 2d 489, 519 (2004). Generally, a scientific technique is new or novel if it is original or striking or does not resemble something formerly known or used. *Donaldson*, 199 Ill. 2d at 79. Under

37

*Frye*, the court considers the general acceptance of a scientific methodology, not the particular conclusions at issue in a particular case. *People v. McKown*, 226 Ill. 2d 245, 255 (2007). There is no "*Frye*-plus-reliability" test in Illinois, in which the court first determines if the technique or methodology is accepted and then considers whether it is reliable. *People v. Nelson*, 235 Ill. 2d 386, 431 (2009).

¶ 79     There is a dual standard of review regarding the admissibility of expert testimony. Abuse of discretion review applies when the question is whether "an expert scientific witness is qualified to testify in a subject area, and whether the proffered testimony is relevant in a particular case." *In re Commitment of Simons*, 213 Ill. 2d at 530-31. *De novo* review applies when this court must determine "whether a *Frye* hearing is required and, if so, whether the scientific technique at issue is generally accepted in the relevant scientific community." *In re Commitment of Simons*, 213 Ill. 2d at 530-31.

¶ 80     Here, prior to trial, defendant filed a motion requesting a *Frye* hearing on the admissibility of the DNA evidence against him. By that motion he argued that, because the rape kit and the original blanks and controls made by Dr. Benzinger were no longer available, forensic scientist Anderson created new blanks and controls for testing. Defendant claims this subsequent testing by Anderson, though consistent with scientific protocol at the time of testing, was contrary to scientific protocol by the time of trial and, accordingly, was impermissible. In part, the motion alleged:

> "It has subsequently been learned that the Illinois State Crime Lab lost the controls or blanks each of the original 3 fractions of DNA. However, a new control or blank was manufactured and used. Such a method is no longer acceptable under current protocols of the lab. This is the reasons [*sic*] that the Lab

had refused to test the 3rd Fraction of DNA. Testing was performed on the First [*sic*] two fractions under this not acceptable method of DNA testing. The analyst, Cynara Anderson, who performed that testing and used new blanks or controls has told Defense Counsel that she has no idea if it is generally accepted in the scientific community, as required by *Frye*, to use the results of the previous testing because the method used is not currently permitted as an acceptable Forensic DNA testing procedure. Additionally, the original vitullo kit (rape kit) has been lost or destroyed, so re-testing under generally accepted DNA testing procedures is not an option."

Defendant argues Anderson's methodology was appropriate and accepted in 2005, but that the FBI standards changed in 2009 to include more stringent rules regarding testing procedures.

¶ 81　　　After a hearing on the motion, the trial court denied the request for a *Frye* hearing regarding the DNA testing without the original blanks, stating: "*Frye* does not apply once determined that the scientific method is generally accepted" and noting that "[t]here is no *Frye* standard plus reliability standard, no independent evaluation of the theory or the reliability once the general acceptance threshold has been met. Reliability comes from general acceptance." The court further explained that defendant's arguments regarding the DNA testing "goes to the weight, not the admissibility under *Frye*," and that defendant's concerns could be addressed at trial through "vigorous cross-examination presentations of contrary evidence such as expert testimony." It stated, "[t]he *Frye* standard applies only if scientific principle and technique or test offered is new or novel."

¶ 82      Although defendant argues on appeal that the DNA evidence should have been inadmissible because the methodology used by Anderson was outdated at the time of trial (but not at the time of testing), this argument is actually based on the trial court's denial of defendant's motion requesting a *Frye* hearing. On appeal, defendant does not challenge the trial court's ruling and does not argue that the trial court abused its discretion in denying the motion for a *Frye* hearing. Defendant did not preserve this issue by objecting at trial or including it in his posttrial motion (*Enoch*, 122 Ill. 2d at 186), and he has not argued on appeal that we should consider it based on plain error (*Herron*, 215 Ill. 2d at 186-87). We therefore find this issue to be forfeited.

¶ 83      Even if the issue was not forfeited, however, and we considered it under a plain error analysis, we would still find no error. See, *e.g.*, *Wilson*, 404 Ill. App. 3d at 247 ("There can be no plain error if there was no error at all ***."). A *Frye* hearing is limited to situations where the technique or test is new or novel, or, for example, where the scientific test does not resemble a formerly known or used test. See *In re Marriage of Bates*, 212 Ill. 2d at 519 (trial court will apply the *Frye* test only if the scientific principle, technique, or test offered by the expert to support his or her conclusion is new or novel); *Donaldson*, 199 Ill. 2d at 79 (generally, a scientific technique is new or novel if it is original or striking or does not resemble something formerly known or used). At the time she ran the test in 2005, Anderson followed all relevant protocols. We find no error in the trial court's determination that no *Frye* hearing was required where the test and methodology used by Anderson was not new or novel.

¶ 84              C. DNA Exclusion Based on Inadvertent Laboratory Spillage

¶ 85    Next, defendant contends that the trial court erred when it denied his motion to exclude the DNA evidence where a portion of the DNA material was spilled during laboratory testing. He claims he was prejudiced because, had the evidence not been spilled, it is possible the subsequent test on the remaining four DNA loci may have excluded him.

¶ 86    Defendant filed a motion for relief in conjunction with destruction of DNA or related evidence, by which he sought, in pertinent part, to exclude the DNA evidence because of the spillage. The court denied the motion after a hearing, finding that the evidence was not materially exculpatory and that it was not destroyed in bad faith. Additionally, the court admonished defense counsel that the use of the term "destroyed" was inappropriate, noting that the evidence was not "destroyed in a bad faith sense or somebody just took something and obliterated it. *** What we have here is something that's spilled during a test requested by the parties[.]"

¶ 87    As for the spill itself, forensic scientist Anderson described the spill at trial in the following manner:

        "A. [FORENSIC SCIENTIST ANDERSON:] There was an incident that occurred during the application stage, during the preparation of amplification stage.

        Q. [ASSISTANT STATE'S ATTORNEY WEISS:] What happened during the amplification stage?

        A. When it was time for me to take my DNA and put it into my tubes to amplify my F2 fraction, which is the sperm fraction of the vaginal swab, I dropped that tube of DNA onto my exam paper. So I was able to put the required amount of DNA into—there are two—so if I have a tube for F1, the DNA from

my F1 tube will be split into two additional tubes for amplification. One tube will give me nine loci, and the other tube will give me four loci.

So when I was preparing my samples to split them into their nine loci tube and four loci tube, I dropped my tube of DNA, and it spilled on the paper.

So I did have some in my tube after some spilled out, so I was able to put what I needed into the tube for the nine loci, but I had an undetermined amount left over in that tube to put in the tube that would have given me four loci. So I wasn't sure of my target, but I know I put in less than what I needed in that second tube.

Q. But you were able to obtain a test for the nine loci, correct?

A. Yes. I had more than enough for what I needed for the nine loci tube. But I had an undetermined amount target for the four loci tube.

Q. Just so we're clear, all these fractions F1, F2, F3, that's all coming from the sperm sample, correct?

A. From the vaginal swab of [T.C.].

Q. All coming from the vaginal swab?

A. Yes.

Q. And were there different samples or did you learn of different things that were in the vaginal swab?

A. Yes, after amplification, the samples are ready to be put on another instrument that will result in me having a DNA profile. So after amplification, I set up that procedure and then I have a DNA profile.

42

And it led to my non-sperm fraction having a profile matching [T.C.]. And my sperm fraction having a profile of an unknown male profile. And then I also verified that my blank was clean.

But the tube that was giving me four loci, it flat lined. I didn't get anything.

Q. But it's not uncommon that you only have nine loci in cases, is it?

A. It's not uncommon. Sometimes you may only end up with nine loci, not because of just dropping a tube."

¶ 88    Anderson acknowledged on cross-examination that she was only able to determine the values at nine loci because she spilled the DNA, that she did not know the profile for the additional four loci, and that if any of the remaining four loci did not match defendant, he would be excluded as the offender. Specifically, she said:

"Q. [PUBLIC DEFENDER ANDERSON:] *** If any one of those [remaining four un-resulted loci] is different than David Banks, then you could say with scientific certainty that he is not the offender; is that correct?

A. [FORENSIC SCIENTIST ANDERSON:] That's correct.

Q. But you don't know what those are, correct?

A. That's correct.

Q. In fact, you spilled that DNA on your table, correct?

A. That's correct."

¶ 89    The State relies on *Arizona v. Youngblood*, 488 U.S. 51 (1988) (Stevens, J., concurring, and Blackmun, J., dissenting, with Brennan and Marshall, JJ., joining), in support of its argument that a defendant must show that the evidence was destroyed in bad faith in order

for relief. In *Youngblood*, the defendant was convicted of child molestation, sexual assault, and kidnapping. During the medical treatment of the victim, doctors collected evidence of the attack using a sexual assault kit, including samples of blood, saliva, and hair. These samples were refrigerated at the police station. The victim's underwear and T-shirt, which contained small amounts of semen, were also collected by the police but not refrigerated or frozen. *Youngblood*, 488 U.S. at 52-53. Using the evidence from the sexual assault kit, a criminologist determined that sexual contact had occurred, but he did not perform any other tests. He replaced the kit in the refrigerator. Later, the criminologist was unable to obtain conclusive results in testing the underwear and T-shirt due to the small quantity of semen present. *Youngblood*, 488 U.S. at 54. At trial, the defendant argued that the victim had erred in identifying him in a photographic lineup as the assailant. The trial court instructed the jury that, if they found that the State had destroyed or lost the evidence, they might "infer that the true fact is against the State's interest." (Internal quotation marks omitted.) *Youngblood*, 488 U.S. at 54. The jury found the defendant guilty, but the Arizona Court of Appeals reversed, finding a violation of due process where the loss of the evidence was material to the defense. *Youngblood*, 488 U.S. at 54.

¶ 90       The United States Supreme Court considered the extent to which the due process clause of the fourteenth amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant. Considering the " 'area of constitutionally guaranteed access to evidence,' " the *Youngblood* court reversed, finding that the defendant was required to demonstrate bad faith on the part of the State in the destruction or loss of the evidence. *Youngblood*, 488 U.S. at 55 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). The Court found that the due process clause "required a different result when we

deal with the failure of the State to preserve evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. The Court justified the difference in treatment between a situation in which the State fails to disclose to the defendant material, exculpatory evidence, and a situation where potentially exculpatory evidence is permanently lost, as necessary in order to avoid placing on the courts the " 'treacherous task of divining the import of materials whose contents are unknown and, very often, disputed' " (*Youngblood*, 488 U.S. at 58 (quoting *California v. Trombetta*, 467 U.S. 479, 486 (1984))) and placing on the police an absolute duty to retain and preserve material that might be of conceivable evidentiary significance in a particular prosecution. *Youngblood*, 488 U.S. at 58. The *Youngblood* Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. The court characterized the failure of the police to refrigerate the clothing and to perform tests on the semen samples as negligent, at worst, and in the absence of bad faith, no violation of the due process clause occurred. *Youngblood*, 488 U.S. at 58.

¶ 91    In Illinois, our supreme court has held that there was no due process violation where there was no demonstration of bad faith by the State when the evidence in question—the defendant's vehicle—was lost or destroyed before trial. *People v. Sutherland*, 223 Ill. 2d 187, 237 (2006). The *Sutherland* court, guided by *Youngblood*, held that the defendant "failed to offer anything, other than mere speculation, demonstrating bad faith by the State." *Sutherland*, 223 Ill. 2d at 237.

¶ 92    Here, we find no error by the trial court in requiring a showing of bad faith by the defendant before it would exclude the DNA evidence. Where, as here, the evidence in question is not exculpatory, a defendant must show bad faith in failing to preserve the evidence. *Youngblood*, 488 U.S. at 58 ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Defendant offers nothing but mere speculation to demonstrate bad faith by the State. In fact, there is no demonstration here of anything other than an inadvertent spill by a scientist who then was able to complete the 9-loci sample (also known as the Pro-filer component) with a match to defendant, and attempted to complete the other 4-loci sample (also known as the Co-filer component), which ended with no results. This, as the trial court explained, was a mere accident and was absent of bad faith. Where defendant could not show that the spilled DNA evidence was materially exculpatory, and could not then fulfill his burden to show bad faith in the loss or destruction of the DNA evidence, the failure to preserve the evidence did not constitute a due process violation under *Youngblood*, and the exclusion of the evidence was not necessary.

¶ 93    We note here with some concern that defense counsel on appeal, who, as he should, argues vigorously in defense of defendant, goes beyond what appears to be the truth in this particular argument. In his opening brief, he argues that the State "botch[ed] the Co-Filer test" and this spill "consumed all the remnants [of the DNA sample] usable for testing." This is belied by the record, however, which shows that on August 4, 2011, the trial court ordered additional DNA analysis on the DNA extract that remained from the vaginal swabs.

¶ 94    Additionally, we acknowledge defendant's concern that this ruling puts him in a logically inconsistent, difficult position in which, to obtain a remedy for the absence of testing, he first

must obtain the testing, or know and be able to demonstrate the outcome of the testing. While we recognize this concern, defendant does not offer this court any authority by which we should disregard the established authority discussed herein. Under *Youngblood* and *Sutherland*, defendant's claim is unavailing.

¶ 95        We find that the trial court properly denied defendant's motion to exclude the DNA evidence based on the loss of DNA material during testing.

¶ 96                    D. Limiting the Questioning of the DNA Expert at Trial

¶ 97        Next, defendant claims the trial court erred when it limited the defense in its cross-examination of forensic scientist Anderson at trial. Specifically, defendant argues that the trial court should have allowed defense counsel to question Anderson regarding database searches done in Illinois and Arizona regarding a determination of how many 9-loci matches exist within an offender database. Defendant believes he merits a new trial where he was denied the ability to meaningfully challenge the scientific evidence presented by the State.

¶ 98        Initially, the State argues that, although defendant filed a motion for DNA testing prior to trial, he later withdrew that motion (as discussed in the background section, above). Therefore, the State claims that this motion is no longer in at issue. Defendant admits the motion was withdrawn when defense counsel "received what he believed was adequate data for his purposes." Defendant, however, responds that the State's analysis elevates form over substance where, as here, the issues at question were further dealt with during the trial. We agree with the State that defendant can no longer argue specific to the withdrawn motion, but also agree with defendant that the issues "were put back in play by the State" when the State sought at trial to bar cross-examination of its expert due to her unfamiliarity with specific studies on 9-loci match frequencies.

¶ 99     During trial but before the presentation of testimony by the forensic scientists, the State asked the court to preclude questions regarding searches done of the offender sections of the Arizona and Illinois databases where 9-loci matches were examined. The following colloquy occurred outside the presence of the jury:

> "[ASSISTANT STATE'S ATTORNEY MARY LACY:] Judge, the third witness Cynara Anderson who is going to testify about DNA results in this case, counsel informs us he wants to ask the witness about studies done on an Arizona database, an Illinois database where nine loci matches were examined.
>
> She has no knowledge about such studies and the results of the studies. So we ask—aside which they're irrelevant. So we would ask that that question not occur.
>
> THE COURT: [Public Defender] Mr. Anderson, when I sustained the objection previously, this can be on the record, you're asking somebody something they have no knowledge of.
>
> * * *
>
> I don't know if [Anderson] is aware of the Arizona studies or the Illinois studies on nine loci, whether she has read them or not. But certainly if she is not aware and hasn't read them, she can't be asked about them.
>
> [PUBLIC DEFENDER ANDERSON:] I think what the State had talked to me about was that they didn't want the substance of these studies coming out because she didn't know about them. Obviously, I'm not going to bring out something that the witness is unaware of because it wouldn't be in evidence.

But I intend to ask, and I think I have a right to ask her, if she is aware of any studies about nine loci matches in the actual population, or if she looked into whether there are such studies.

THE COURT: When you say studies, do you have [a] specific study you're going to ask her about or are you asking about studies—just the general term studies?

[PUBLIC DEFENDER ANDERSON:] In fact, there are three studies. There is Arizona, there is Illinois, which is a little surprising she is not aware of that one and—

THE COURT: She's not aware of Arizona and not aware of Illinois.

[PUBLIC DEFENDER ANDERSON:] And there is Maryland.

* * *

But the fact that she is holding herself out as an expert in DNA and matches in database and hasn't even looked to see how many people actually match at nine, I think that is relevant that she hasn't even looked.

* * *

THE COURT: If she's unaware of Illinois, Maryland and Arizona, those are the three studies you're talking about, if she is unaware of something, how can you question her on it?

[PUBLIC DEFENDER ANDERSON:] If she has even looked is the question.

* * *

The State has told me, and I will accept their representation, that she doesn't know about this. This goes to her ability to—this goes to her qualification as an expert. A person who is an expert in the field of DNA, forensic DNA who is testifying about a partial nine loci match who has made no effort to see what the results of that are in the actual population I think is relevant that the expert makes no efforts—

THE COURT: Let me ask you this. If you ask her if she has looked at these three studies and she says no, are you prepared to prove up those studies exist?

* * *

Because we're not going to leave a question hanging where someone didn't look at something and they're being held not knowing what those things say.

You say you're not bringing the results. So what is the jury going to get out of this? You're setting up a straw person to knock them down. Have you looked at this study, this study, or this study? No, no, no. Then what are you going to argue? She doesn't even look at studies.

[PUBLIC DEFENDER ANDERSON:] Judge, it's not a straw person. The fact of the matter is she is unaware of actual studies that exist. I'm not making this up. There are studies. I have a good faith basis for asking this. There are actual studies.

THE COURT: If you want to ask her if she is aware of these studies and she can give an answer yes or no[.]"

Ultimately, the court accepted defense counsel's representations that he would simply ask Anderson if she was aware of the existence of the studies and, if she answered yes, then ask if she was aware of the results on 9-loci matches. The court specifically ruled that defense counsel could ask "whatever foundational questions you want to ask" about whether the expert was "aware" of the searches or "looked" at the searches. Defense counsel, however, did not ask Anderson the two questions the court would allow.

¶ 100    We first address the applicable standard of review. Defendant urges this court to employ a *de novo* standard, arguing that this is a review of a motion for forensic testing. The State responds that the proper standard is abuse of discretion, as the motion itself was withdrawn and the argument now applies only to the court's ruling limiting the cross-examination of forensic scientist Anderson. We agree with the State. "Clearly, the scope and extent of cross-examination and re-cross-examination are within the discretion of the court." *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 998 (2007) (citing *People v. Kirchner*, 194 Ill. 2d 502, 536 (2000)). " '[C]ross-examination should be kept within fair and reasonable limits, and it is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere.' [Citation.]" *Adams*, 369 Ill. App. 3d at 998. As we are reviewing the propriety of the court's limiting the scope of cross-examination, we will apply an abuse of discretion standard.

¶ 101    Defendant's argument here is based on the frequencies to which Anderson testified, that is, that defendant's DNA would be expected to occur in 1 in 52 million black males. He concedes that the frequencies in this case were calculated using generally accepted methodology, and acknowledges our supreme court's decision in *People v. Miller*, 173 Ill. 2d 167 (1996)), which first approved of the use of the statistical method (known as the product

rule) which was used in this case. He argues, however, that the circuit court's rulings, which "effectively barred inquiry into the questionability of 9-loci matches," gave too much weight to the match.

¶ 102    To support his claim, defendant relies in *People v. Wright*, 2012 IL App (1st) 073106, to argue that the results of offender database searches call the reliability of the frequency calculations in this case into question. In *Wright*, a different division of this court discussed the merits of DNA analysis in court procedures. In *Wright*, the cold-case DNA evidence constituted essentially the sole evidence used to identify the defendant from a felony database as the perpetrator of a sexual assault where the victim could not identify her attacker. *Wright*, 2012 IL App (1st) 073106, ¶ 81. Addressing the trial court's error in failing to order, pursuant to a section 116-5 (725 ILCS 5/116-5 (West 2006)) motion, a pretrial 9-loci analysis between his DNA and a male DNA profile obtained from the victim's rectal swabs, the *Wright* court ultimately reversed and remanded for a new trial. *Wright*, 2012 IL App (1st) 073106, ¶ 132.

¶ 103    The *Wright* majority acknowledged the fact that they were not asked to determine whether the expert's conclusion of a "match" based on only nine loci was correct but, instead, they had been asked to determine whether the trial court abused its discretion in denying the defense the ability to investigate and impeach that conclusion. *Wright*, 2012 IL App (1st) 073106, ¶ 86. The court stated:

> "The dangers of partial matches have been known for over a decade. For example, in a highly publicized English case, Raymond Easton was charged in 1999 with burglary after police had a ' "cold hit" ' with his DNA in a database. Jennifer L. Mnookin, *Fingerprint Evidence in an Age of DNA Profiling*, 67

Brook. L. Rev. 13, 49-50 (2001); Allison Pari, *Note, An International DNA Database: Balancing Hope, Privacy, and Scientific Error,* Note, 24 B.C. Int'l & Comp. L. Rev. 341, 368-69 (2001). His DNA 'matched' the DNA from the crime scene at six loci. Since British police estimated that there was only a 1 in 37 million chance that such a match would occur at random, he was charged with burglary. Mnookin, *supra*, at 50; Pari, *supra*, at 368-69. When Easton, who had advanced Parkinson's disease, had an alibi, the police ran a test at more loci and discovered that his DNA did not match at all. Mnookin, *supra*, at 50; Pari, *supra*, at 368-69. The charges were, of course, dropped. Mnookin, *supra*, at 50; Pari, *supra*, at 368-69.

As a result of the Arizona, Maryland and Illinois searches, some legal scholars and scientists have questioned whether the extraordinarily large figures used in court to estimate the probability of a nine-loci "match" are "no better than alchemy." David H. Kaye, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid Of?*, 19 Cornell J.L. & Pub. Pol'y 145, 146 (2009); Strutin, *supra*, at 54 (after the Arizona, Maryland and Illinois searches, 'academics and experts have added their voices in calling for access to the DNA databanks to test the assumptions of profile rarity'). For example, a Stanford mathematician has called these numbers ' "total nonsense" ' and ' "a damned lie." ' Kaye, *supra*, at 148 (quoting Keith Devlin, *Damned Lies*, Mathematical Association of America (2006), *available at* http://www.maa.org/devlin/devlin_10_06.html.). He has stated that admitting this testimony into court is ' "disgraceful," ' and that courts ' "may as well admit alchemy and astrology." ' Kaye, *supra*, at 147 (quoting

Keith Devlin, *Damned Lies*, Mathematical Association of America (2006), *available at* http://www.maa.org/devlin/devlin_10_06.html.).

Although the trial court in the case at bar was not presented with the results of the Maryland or Illinois searches, the trial court did have in front of it a report from the search of the Arizona database, which revealed 120 pairs of 9-loci 'matches' in a database of 65,493 offenders. 19 Cornell Kaye, *supra*, at 154-55 (describing how the Arizona study was conducted and its results). As one legal scholar has asked, if the frequency 'for a nine-locus match is anything like "one in 754 million for whites, and one in 561 million for blacks" [as some DNA experts testify], how can it be that a database as small as [Arizona's with] "a mere 65,493 entries" produces even one such match?' Kaye, *supra*, at 155; Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence*, 95 Calif. L. Rev. 721, 781 (2007) ('recent evidence calls into question the accuracy of using the product rule to convey match probabilities').

We have not been asked to determine whether the expert's conclusion of a 'match' based on only nine-loci was correct. We have been asked to determine whether the trial court abused its discretion in denying the defense the ability to investigate and impeach this conclusion. Considering that a nine-loci analysis was the primary identification evidence against defendant, the trial court abused its discretion by denying defendant's motion. *Cf. People v. Watson*, 2012 IL App (2d) 091328, ¶ 25 (defense counsel was ineffective for failing to probe the statistical meaning of a seven-loci 'match' when plenty of arguments and evidence were available)." *Wright*, 2012 IL App (1st) 073106, ¶¶ 83-86.

¶ 104     A different division of this court disagreed with the holding in *Wright* and found it unpersuasive. See *People v. Crawford*, 2013 IL App (1st) 100310. The *Crawford* court considered, in part, the question of whether a defendant was denied the effective assistance of trial counsel where counsel failed to convey to the jury the significance of a partial DNA match. *Crawford*, 2013 IL App (1st) 100310, ¶ 123. The *Crawford* court found that the theories relied upon by the *Wright* majority regarding the significance of the offender database searches have been discredited. Specifically, the *Crawford* defendant argued, in part, that he was denied the effective assistance of trial counsel because counsel failed to cross-examine the DNA expert in such a way that the expert would "explain why the frequency of the evidentiary profile was not as unique as she suggested." *Crawford*, 2013 IL App (1st) 100310, ¶ 128. The court held there was no ineffective assistance of counsel where, in part:

> "defendant's complaints regarding the failure to argue with respect to an alleged search of the Illinois DNA database that revealed nearly 2,000 profiles that matched at nine loci has been discredited. As defendant's own source explains, these database trawls seek all possible pairs in a database (rather than one specific nine-loci grouping), which result in a staggering number of comparisons. See David H. Kay, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid of?*, 19 Cornell J.L. & Pub. Pol'y 145, 157 (2009). For example, if the database for the state of Arizona contains 65,493 entries, a comparison search would produce over 2 billion distinct pairs. *Id.* A search for 9 loci or more out of 13 loci (or, 715 distinct combinations of 9 items out of 13) would produce 1.5 trillion 'opportunities to find nine-locus matches' within the Arizona database. *Id.*

Applying the same methodology to defendant's asserted claim of 220,456 profiles in the Illinois database would result in 24.3 billion distinct pairs and a corresponding 17.4 *trillion* opportunities to find 9-locus matches out of 13-loci. If, as defendant claims, there were '903 pairs of profiles matching at 9 loci,' that probability would be vanishingly small when compared with 17.4 trillion possible pairs, and trial counsel's argument as to this point would not have been of even arguable merit." *Crawford*, 2013 IL App (1st) 100310, ¶ 133.

Because counsel could not be ineffective for making a "fruitless argument," the *Crawford* court concluded that trial counsel could not have been ineffective for failing to hire an expert and develop an argument that the offender database searches impeached the statistics in that case. *Crawford*, 2013 IL App (1st) 100310, ¶ 133.

¶ 105      We disagree with defendant's assertion that *Wright* is "precisely on point." Specifically, the *Wright* majority opinion does not demand a trial court allow cross-examination of a DNA expert regarding a potential database search in all cases involving partial DNA profiles. Rather, in a fact-specific analysis, the *Wright* court held that, where the *Wright* defendant had fully preserved the issue for appeal, and where the expert had been provided the specific study in question for review prior to trial, and the State had already obtained a favorable ruling on the motion *in limine* on that specific issue, the trial court erred in "barring any questions about [the study]" (*Wright*, 2012 IL App (1st) 073106, ¶ 132). Here, in contrast, the State had not obtained a favorable ruling on the motion *in limine*, but instead, defense counsel had withdrawn the motion of its own accord, and, importantly, the trial court did not bar all questions about the study. Rather, as defendant concedes on appeal, the trial court specifically ruled that defense counsel could ask "whatever foundational questions you want

to ask" about whether the expert was "aware" of the searches or "looked" at the searches. Defense counsel, however, failed to take advantage of this opportunity and did not ask the expert questions about the database searches. For these reasons, *Wright* does not offer assistance to the case at bar.

¶ 106    We find no abuse of discretion here, where the trial court properly limited the cross-examination of the DNA expert to subjects relevant to the case and to her expertise, and the DNA expert employed an approved statistical method when she calculated the DNA frequencies.

¶ 107    In summary, we find no error in the admission of DNA evidence at trial.

¶ 108                    II. Other Crimes Evidence

¶ 109    Next, defendant contends he was deprived a fair trial where the court allowed the "misuse" of his prior criminal record. Specifically, defendant argues that the jury was misinformed as to the proper way to use evidence of prior convictions because the jury instructions provided them did not draw a distinction between a conviction adduced for impeachment purpose and one adduced for propensity purposes. To be clear, defendant does not contest the admission of the other crimes evidence at trial. Rather, defendant claims that the instructions provided to the jury in this case were both inadequate and incorrect in that they did not explicitly include the names of the offenses for which defendant was previously convicted. We disagree.

¶ 110    Initially, we note that defendant failed to preserve this issue for review where he neither objected at trial nor included this issue in his posttrial motion. See *Thompson*, 238 Ill. 2d at 611-12 ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion.") (citing *Enoch*, 122 Ill. 2d at 186-87). "Generally,

a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a posttrial motion." *People v. Downs*, 2015 IL 117934, ¶ 13. This encourages a defendant to raise issues before the trial court, "thereby allowing the court to correct its errors before the instructions are given, and consequently precluding a defendant from obtaining a reversal through inaction." *Downs,* 2015 IL 117934, ¶ 13 (citing *Piatkowski*, 225 Ill. 2d at 564). However, "substantial defects" in criminal jury instructions are not waived by the failure to object "if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). Rule 451(c) is coextensive with the plain error clause of Illinois Supreme Court Rule 615(a) and is construed identically. *Piatkowski*, 225 Ill. 2d at 564. As noted previously, the plain error doctrine allows a reviewing court to consider unpreserved error "when (1) a clear or obvious error occured and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occured and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Under the plain error rule, we consider whether any error has occurred at all. *Lewis*, 234 Ill. 2d at 43; *Wilson*, 404 Ill. App. 3d at 247 ("There can be no plain error if there was no error at all ***."). This requires a "substantive look" at the issue raised. *People v. Johnson,* 208 Ill. 2d 53, 64 (2003). We will therefore first review defendant's claim to determine if there was any error before considering it under plain error.

¶ 111 "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). It is sufficient if the

instructions given to the jury, considered as a whole, fully and fairly announce the applicable law. *Bannister*, 232 Ill. 2d at 81; *People v. Mohr*, 228 Ill. 2d 53, 65 (2008) (On review, the question is whether the instructions, considered as a whole, fully and fairly announce the law applicable to the theories of the parties). Supreme Court Rule 451(a) requires that, where a court in a criminal case determines that the jury should be instructed on a subject, and the Illinois Pattern Jury Instructions contains an applicable instruction, then the IPI " 'shall' be given unless the court determines it does not accurately state the law." *People v. Durr*, 215 Ill. 2d 283, 301 (2005) (citing Ill. S. Ct. R. 451(a) (eff. July 1, 1997)).

¶ 112    A trial court's decision regarding jury instructions and verdict forms is reviewed under an abuse of discretion standard. *People v. Battle*, 393 Ill. App. 3d 302, 313 (2009) (citing *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997)). It is within the discretion of the trial court to determine the applicability of specific jury instructions. *People v. Castillo*, 188 Ill. 2d 536, 540 (1999).

¶ 113    Here, the trial court allowed the State to present evidence that defendant committed a sexual assault against G.R. in 1984 as relevant to defendant's propensity to commit sexual attacks, motive, and intent. Prior to trial, the State filed a motion *in limine* seeking to introduce evidence of a prior crime at trial, that is, a 1984 sexual assault, as relevant to the issues of defendant's propensity to commit sexual attacks and to motive and intent, as two of the murder counts on trial were predicated on the alleged sexual assault of T.C. After hearing arguments from the parties, the court allowed evidence of the prior sexual assault as evidence of defendant's propensity to commit sexual attacks, motive, and intent, as two of the murder counts on trial were predicated on the alleged sexual assault of T.C. Specifically, the court determined:

"It is clear that in viewing the proof of other crimes sought to be admitted, it's relevant to the issues of defendant's propensity to commit sexual attacks and to motive and intent. The statute [and] case law mandates this Court to allow the People to present evidence of other crimes discussed above."

¶ 114　　　　During trial and prior to presenting the testimony of G.R., the trial court instructed the jury:

"Ladies and gentlemen, in a moment evidence will be received that the Defendant has been involved in an incident other than those charged in the indictment before you. This evidence will be received on the issue of Defendant's propensity. And may be considered by you only for that limited purpose."

¶ 115　　　　The court also allowed evidence of the 1990 murder conviction "for the very limited purpose" of impeachment in the event defendant were to testify. Specifically, after defendant testified, the State entered a certified copy of defendant's conviction for murder. The trial court advised the jury:

"Evidence of the Defendant's previously [*sic*] conviction of an offense may be considered by you only as it may affect his believability as a witness, and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 116　　　　At the close of trial, the court instructed the jury regarding the presumption of innocence. It then instructed the jury, in pertinent part:

"Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

* * *

60

Evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged.

Evidence has been received that the Defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issue of the Defendant's propensity and may be considered by you only for that limited purpose. It is for you to determine what weight should be given to this evidence on the issue of propensity."

¶ 117    The jury instructions with which defendant is concerned are Illinois Pattern Jury Instructions, Criminal, No. 3.13 and No. 3.14 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.13 and No. 3.14) IPI Criminal 4th No. 3.13 states:

"Evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged." IPI Criminal 4th No. 3.13.

There is no blank in IPI Criminal 4th No. 3.13 to insert the name of the offense of which the defendant was previously convicted.

¶ 118    IPI Criminal 4th No. 3.14 states:

[1] Evidence has been received that the defendant[s] *[(has) (have)]* been involved in *[(any offense) (offenses) (conduct)]* other than *[(that) (those)]* charged in the *[(indictment) (information) (complaint)]*.

[2] This evidence has been received on the issue[s] of the *[(defendant's) (defendants')] [(identification) (presence) (intent) (motive) (design) (knowledge) (_____)]* and may be considered by you only for that limited purpose.

[3] It is for you to determine [whether the defendant[s] *[(was) (were)]* involved in *[(that) (those)] [(offense) (offenses) (conduct)]* and, if so,] what weight should be given to this evidence on the issue[s] of _____." (Emphasis added.) IPI Criminal 4th No. 3.14.

¶ 119　　　As given, IPI Criminal 4th No. 3.14 states:

Evidence has been received that the defendant has been involved in an offense other than those charged in the indictment.

This evidence has been received on the issue of defendant's propensity and may be considered by you only for that limited purpose.

It is for you to determine what weight should be given to this evidence on the issue of propensity.

Like IPI Criminal 4th No. 3.13, IPI Criminal 4th No. 3.14 does not have a blank in which parties or the court can insert the name of the offense in which the defendant was involved.

¶ 120　　　Here, each instruction given the jury was taken from the Illinois Pattern Jury Instructions, and each accurately stated the law. Accordingly, the instructions comported with Supreme Court Rule 451(a), which requires that, where a court in a criminal case determines that the jury should be instructed on a subject, and the Illinois Pattern Jury Instructions contains and applicable instruction, then the IPI " "shall' be given unless the court determines it does not accurately state the law." *Durr*, 215 Ill. 2d at 301 (2005) (citing Ill. S. Ct. R. 451(a) (eff. July 1, 1997)). In addition, the oral instructions given by the court at the close of the case matched

the IPI instructions. Moreover, as noted above, the court repeatedly informed the jury that the other crimes were being admitted for limited purposes. Specifically, the court told the jury immediately prior to G.R.'s testimony that her testimony was received only on the issue of defendant's propensity, and, when the State introduced a certified copy of defendant's prior murder conviction, the court informed the jury that the evidence was to be considered only as it may "affect [defendant's] believability as a witness, and must not be considered by you as evidence of his guilt of the offense with which he is charged." These jurors, who were properly instructed by the trial court, are presumed to follow their instructions. See, *e.g.*, *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them.").

¶ 121    We find no error here, where, when considered as a whole, the jury instructions in this case fully and accurately informed the jury of the applicable law, and the court carefully instructed the jury throughout the trial and at the close of trial that the other crimes evidence was to be considered for particular, limited purposes.

¶ 122    Defendant also contends he was denied the effective assistance of trial counsel where his counsel did not tender alternative instructions to the jury. Specifically, defendant claims counsel should have tendered modified other crimes instructions that specifically identified defendant's previous crimes and the purpose for which each was allowed into evidence. Defendant urges that the proper instructions would have been:

> "Evidence of a Defendant's previous conviction *on the offense of murder* may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offenses with which he is charged."

And:

> "Evidence has been received that the Defendant has been involved in *a prior sexual assault*. This evidence has been received on the issue of Defendant's propensity and may be considered by you only for that limited purpose. It is for you to determine what weight should be given to this evidence on the issue of propensity."

¶ 123    Every defendant has a constitutional right to the effective assistance of counsel. See U.S. Const., amends VI, XIV; Ill. Const. 1970, art. 1, § 8. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). To establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that he was prejudiced by this deficient performance. *Strickland*, 466 U.S. at 687-88; *Albanese*, 104 Ill. 2d 504. Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994). To satisfy the first prong, a defendant must overcome the presumption that contested conduct which might be considered trial strategy is generally immune from claims of ineffective assistance of counsel. *People v. Martinez*, 342 Ill. App. 3d 849, 859 (2003). To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different. *People v. Easley*, 192 Ill. 2d 307, 317 (2000). Specifically, the defendant must show that counsel's deficient performance rendered the result of the proceeding unreliable or fundamentally unfair. *Easley*, 192 Ill. 2d at 317-18.

¶ 124    Defendant's claim in this regard fails because, as noted above, he was not prejudiced as a result of the jury not receiving modified instructions. In addition, defendant's claim fails because he is unable to overcome the presumption that the contested conduct was not sound trial strategy, where counsel could have reasonably made the sound strategic determination not to focus the jury's attention on defendant's prior crimes. See *People v. Johnson*, 368 Ill. App. 3d 1146, 1161 (2006) (Defendant was unable to show his trial counsel was ineffective where counsel failed to request a limiting instruction for other-crimes evidence because "[c]ounsel may have made a tactical decision not to request such an instruction to avoid unduly emphasizing the other-crimes evidence.").

¶ 125    III. Defendant's Invocation of His Right to Remain Silent and His Request for Counsel

¶ 126    Next, defendant contends the trial court erred in denying his motion for a mistrial based on Lieutenant Wojcik's testimony on cross-examination that all questioning of defendant ceased when defendant asked for a lawyer. Defendant contends this error "places an impermissible cost on the exercise of constitutional rights, and severely prejudices [defendant's exercise of his rights] and the provision of a fair trial." We disagree.

¶ 127    The record in this matter reveals that, after defendant was provided with his *Miranda* rights, defendant made an oral statement regarding the crimes. Although he did not admit in this statement that he was the perpetrator of the crimes, he admitted to familiarity with the apartment complex and the murder victim Soucy, admitted he worked in the nearby area, admitted he was in Soucy's apartment when he got angry and "blacked out," only awaking mentally as he was fleeing the burning building, with his hair singed from fire. This statement was presented by Lieutenant Wojcik and assistant State's Attorney Bowden at trial

as an inculpatory statement. Defendant subsequently declined to memorialize that statement when he asked for an attorney.

¶ 128    On cross-examination at trial, defense counsel asked Lieutenant Wojcik why he did not request a court reporter to record defendant's statement. Wojcik responded:

> "[B]ecause at a certain point the defendant asked for an attorney, so we didn't get to that point where we would have called for a court reporter.
>
> ***
>
> *** [I]t would have been—when I got done talking to him it was about 4:15. I want to say it was some time around a little bit after 5:00 o'clock or so when he asked for an attorney. When I was in there with the State's Attorney was the first time he asked for an attorney."

Lieutenant Wojcik explained that it was not his job to call a court reporter, but rather that was the responsibility of the State's Attorney. He said:

> "The State's Attorney would make [the decision to call a court reporter] in consult with [defendant] if he was willing to do that, but while the State's Attorney was speaking to [defendant] he requested an attorney. So at that time all conversation stops."

¶ 129    The trial court then held a sidebar in chambers, and defense counsel asked for a mistrial, arguing that the witness repeatedly emphasized that defendant had requested an attorney. The trial court asked defense counsel why he did not ask for a sidebar earlier, and defense counsel replied, "Because I didn't want to emphasize that he had brought it out[.]" The trial court denied the motion for a mistrial, saying "what prompted the part about the attorney is because you [defense counsel] asked him questions about why weren't charges approved

before the State's Attorney got there," and "the only logical answer he could say upon your continuing questioning is, well, because he asked for an attorney. It was not brought out volitiously [*sic*] by him. In my opinion it was brought out by your continuing questions for that area."

¶ 130    Cross-examination continued, and defense counsel asked Lieutenant Wojcik a series of questions about what he did and did not do while questioning defendant. Specifically, defense counsel asked a series of questions regarding why Wojcik did not drive defendant up to Lawrence Avenue and drive around the neighborhood in order to locate the hair salon where he allegedly had his hair cut after fleeing the fire. Wojcik answered that he tried to find the salon, but did not drive defendant there to do so. Counsel again asked why, when defendant allegedly had said the salon was in the neighborhood but was unsure of the street it was on, Lieutenant Wojcik did not just drive him to Lawrence Avenue to find the salon. Wojcik answered:

> "Again, Counsel, I probably would have done that, but he asked for an attorney, which means at that point everything—any conversations I was having with him about the case had to stop, including putting him in a car and having him to point locations out."

¶ 131    At the close of Wojcik's cross-examination, defense counsel renewed the motion for a new trial, arguing that Lieutenant Wojcik had again mentioned defendant having asked for an attorney. The trial court denied the motion, responding:

> "The problem with this is the way you asked the question once it came out once the charges were approved upon [the assistant State's Attorney] arriving there and it came out that he asked for an attorney and didn't obviously want to

talk to her without one, this was a natural response to a question about after he was through talking putting him in the car and taking him somewhere and having him find someone.

This is exactly what happens when you are not directing him to a particular time. You simply asked a question. I just wanted you to make a record. Your motion for a new trial is denied. This is the fourth time he stated he wanted an attorney."

¶ 132    Under *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), it is error to comment on a defendant's post-arrest silence or his request for counsel. *Doyle*, 426 U.S. at 619. However, " '*Doyle* applies only when a defendant invokes his right to remain silent.' " *People v. Velez*, 388 Ill. App. 3d 493, 508 (2009) (quoting *People v. Patterson*, 217 Ill. 2d 407, 445 (2005)). In Illinois, once a defendant makes a post-*Miranda* oral statement, the introduction of evidence that the defendant subsequently refused to memorialize that statement does not necessarily violate the fifth amendment or conflict with the *Doyle* opinion. See, *e.g.*, *People v. Christiansen*, 116 Ill. 2d 96, 120 (1987) (recognizing that where a defendant fails to remain silent after being apprised of his right to do so and instead makes oral statements, the defendant has relinquished his rights under the fifth amendment and cannot claim that testimony indicating he was unwilling to subsequently memorialize his oral statements violated his right to remain silent); *People v. Ruiz*, 132 Ill. 2d 1, 16 (1989) (under *Christiansen*, the State is allowed "to introduce, in its case in chief, evidence that a defendant made an oral statement but refused to provide a written statement, on the theory that the defendant did not exercise his right to silence"); *People v. Lindgren*, 111 Ill. App. 3d 112, 117 (1982) ("It is not error to elicit a complete recitation of police procedure, even if the

recitation includes reference to a defendant's exercise of his constitutional rights, so long as the recitation is not argued to be indicative of guilt").

¶ 133    Here, the evidence in question was not adduced in order to establish defendant's guilt, but was adduced in response to questioning as to why defendant's statement was not memorialized, as well as in regards to police procedure (*e.g.*, why the officers did not take defendant to the area of the crime and look for the hair salon in order to confirm defendant's statement). Aside from the cross-examination of Lieutenant Wojcik, there was no further mention of defendant's request for counsel, and the State did not reference the testimony in its closing arguments. We find no error in the cross-examination testimony here.

¶ 134    Moreover, where we find no error in this cross-examination testimony, it follows that defendant's argument that he was denied the effective assistance of counsel where counsel directed the cross-examination that brought out the comments regarding defendant's invocation of his fifth amendment rights also fails. *Palmer*, 162 Ill. 2d at 475-76 (failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim).

¶ 135                    IV. Ineffective Assistance of Trial Counsel

¶ 136    Finally, defendant contends he was denied the effective assistance of trial counsel where counsel allegedly made a series of errors regarding the DNA evidence at trial. Defendant claims he was prejudiced where counsel should have (1) thoroughly challenged forensic scientist Anderson regarding the DNA spillage, (2) recognized and then explored the alleged chain of custody violation, (3) asked the allowed two questions regarding the 9-loci database searches, and (4) specifically requested the trial court follow the *Wright* decision. Defendant

argues he merits a retrial where the combination of the above errors denied him a fair trial. We disagree.

¶ 137    As noted above, to establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that he was prejudiced by this deficient performance. *Strickland*, 466 U.S. at 687-88; *Albanese*, 104 Ill. 2d 504. Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. *Palmer*, 162 Ill. 2d at 475-76. To satisfy the first prong, a defendant must overcome the presumption that contested conduct which might be considered trial strategy is generally immune from claims of ineffective assistance of counsel. *Martinez*, 342 Ill. App. 3d at 859. To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different. *Easley*, 192 Ill. 2d at 317. To do so, the defendant must show that counsel's deficient performance rendered the result of the proceeding unreliable or fundamentally unfair. *Easley*, 192 Ill. 2d at 317-18.

¶ 138    As to defendant's first claim, that he was denied the effective assistance of counsel where counsel did not sufficiently challenge forensic scientist Anderson regarding the DNA spillage, we disagree that counsel was ineffective where, even if counsel's performance were deficient, defendant would still be unable to show resulting prejudice. See, *e.g.*, *Palmer*, 162 Ill. 2d at 475-76 (failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim). Our review of the record shows that trial counsel vigorously challenged Anderson's testing and results, as well as the spillage of the DNA material. For example, after the State brought out on direct examination that the spill occurred, defense counsel elicited testimony on cross-examination that Anderson was

only able to determine the values at nine loci because she spilled the DNA, that she did not know the profile for the additional four loci, and that if any of the remaining four loci did not match defendant, he would be excluded as the offender:

> "Q. [PUBLIC DEFENDER ANDERSON:] *** If any one of those [remaining four un-resulted loci] is different than David Banks, then you could say with scientific certainty that he is not the offender; is that correct?
>
> A. [FORENSIC SCIENTIST ANDERSON:] That's correct.
>
> Q. But you don't know what those are, correct?
>
> A. That's correct.
>
> Q. In fact, you spilled that DNA on your table, correct?
>
> A. That's correct."

¶ 139    Defense counsel also thoroughly questioned Anderson regarding her education and qualifications, eliciting testimony during her qualification as an expert regarding her training in population genetics and DQ-Alpha testing. Counsel then argued in closing that Anderson was not sufficiently trained in statistics. Additionally, counsel emphasized in closing argument that the full profile was not known because of the spillage, telling the jury:

> "That they've proven [their] case when their expert spills the rapist DNA, and they don't have a full profile and it's because of what they did that they don't have it."

Defense counsel in this case vigorously cross-examined Anderson regarding her background, experience, qualifications, and the spill itself. Defendant cannot show a reasonable probability that further cross-examination regarding the spill would have changed the result at trial. See *Easley*, 192 Ill. 2d at 317 (to establish prejudice, a defendant must show there is a

71

reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different). Defendant's attempt to show that he was denied the effective assistance of counsel fails.

¶ 140    Defendant's argument that he was denied a fair trial where counsel failed to sufficiently challenge the chain of custody also fails because, as we have determined *inter alia*, there was no breakdown in the chain of custody. Defense counsel, therefore, was not ineffective for not challenging the chain of custody of the DNA extracts where there was no breakdown in the chain of custody.

¶ 141    Defendant's claim that he was denied a fair trial where trial counsel should have asked forensic scientist Anderson the two allowed questions regarding the Arizona and Illinois database searches also fails for lack of resulting prejudice. As noted above, the trial court heard arguments from the parties regarding whether or not Anderson could be examined regarding the database searches. Ultimately, the court ruled that defense counsel could only ask Anderson two questions regarding the studies of database searches: whether she was aware of the studies' existence and, if so, whether she was familiar with their contents. The court expressly ruled that the substance of the searches would not be admissible. Defendant now claims that trial counsel should have asked the two allowed questions and then called its own expert, Donald Parker, who works in the Illinois State Police forensic sciences command DNA indexing laboratory, as a witness to testify about the results of the search of the Illinois offender database. Defendant, as noted above, concedes that the frequencies in this case were calculated using generally accepted methodology, and acknowledges our supreme court's decision in *Miller*, 173 Ill. 2d 167, which first approved of the use of the statistical method (known as the product rule) which was used in this case. Even if Parker

had been called to testify in this case, he would have been limited to reciting the results of the searches; he would not have been able to testify that those search results in any way called into question the DNA frequencies testified to by Anderson in this case because the DNA results in this case were calculated in accordance with generally accepted methodology. Defendant's ineffective assistance argument fails where he is unable to show resulting prejudice.

¶ 142 Finally, defendant's argument that trial counsel was ineffective where, "had defense counsel simply asked the circuit court to comply with this court's decision in *Wright*, the result would necessarily have changed," also is unavailing where counsel did, in fact, ask the court to follow *Wright*. For example, in his May 20, 2010, motion for DNA database search, defense counsel stated, in part:

"8. Wherefore, defendant requests the following DNA database searches pursuant to 725 ILCS 5/116-5 and *People v. Wright*, 2010 Ill. App. LEXUS 245 (Ill. App. 1st Dist., 2010) (reversible error for trial court failing to grant defendant's motion for a DNA Database Search in a 9 loci match case) ***."

The State filed a response to that motion, and defense counsel filed a reply in which he again cited *Wright* and asked the court to follow it. Counsel is not ineffective for failing to "simply ask" the court to comply with a particular case when the record clearly shows that trial counsel did precisely that. Defendant, therefore, cannot show resulting prejudice, and his ineffective assistance of counsel argument is unavailing.

¶ 143                                               CONCLUSION

¶ 144 For all of the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

¶ 145     Affirmed.